Good afternoon, Your Honors. Any furderies for Duke Salisbury, the appellant? Your Honor, in this case there are basically two main issues, divided by sub-issues. Is there a debt owed by Mr. Kandilian, the appellee, to the trustee, to the bankruptcy estate? And if so, is that debt non-dischargeable? The trustee alleged numerous bases for the claim that there was a debt. One of the main ones was the Fraudulent Transfer Act. Under the Fraudulent Transfer Act of California, if a transfer is made by a corporation and it becomes insolvent, or if it is insolvent, then the recipient may have to pay that obligation, that funds that he received back to the trustee. The financial records of the corporation, the debtor in this matter, indicates that on October 22, 1996, the debtor had a de minimis value on its balance sheet. But after the transfer by the corporation, two days later, to Mr. Kandilian, the appellee, of approximately $2.5 million, that would have made the company insolvent. But for one argument, that the line of credit obtained by the corporation in the amount of $3.5 million was not a liability, but instead an asset. And the lower court and the district court reasoned that the loan to the corporation was in fact an asset instead of a liability. And in order to get there, the lower court used the testimony of Kandilian's expert, saying that because the bank looked to Kandilian to decide whether or not the loan should be given to the corporation, the liability is really a contribution to capital. And Judge Morrow in the district court said that some tax cases, like Inlay's, I think it's Inlay's self, or self case, hold that under certain circumstances, a tax obligation can be reduced by deeming a guarantee of an obligation to be an asset of the corporation instead of a liability. I have a question. Correct me if I'm wrong. Both the bankruptcy court and the district court found as a matter of fact that the company, CEI, was solvent at the time of the transfer, correct? That's correct, Your Honor. And that CEI received reasonably equivalent value for the transfer to Kandilian. No. Is that correct? No. Only the lower, the bankruptcy court found that. The district court said that is the Hobson's choice. You can't have it both ways. You can't have the guarantee being an asset and there be consideration for executing the guarantee. It's either or. You can't have it both ways. Let's focus on solvency. Both courts found solvency at the time of the transfer? Yes, Your Honor. What's the standard of review for that finding of fact? Clear error. How was it clearly erroneous? It was clearly erroneous because a loan is not an asset. The only cases that say that you can take a loan guaranteed by a principal and make it into an asset of a corporation are cases that deal with tax issues where no creditors are affected by the choice to make a guaranteed loan an asset. You know, I first read this. I must admit I had to read this, the facts of this transaction and what was going on here several times before I think that I understood it. I'm not sure that I understand it to this day. But at least what struck my eye was that the bankruptcy court pretty much sits in equity to find equitable principles to these kinds of transactions or as it tries to settle up the debts and creditors and debtors and whatnot. And the bankruptcy court made an effort to really look at what was going on in this transaction and made note of the fact that CEI could not have obtained the line of credit on its own. In other words, it didn't have on its own sufficient assets or worth to obtain the line of credit. And it needed Condillion, his personal guarantee and his wife's personal guarantee to secure that loan, that line of credit. And in the end, we know that Condillion ended up having to make good on the debt as well. Yes. So what's wrong with the bankruptcy court looking, at least from its perspective, as to the true nature of the transaction? It was really a loan. You know, this was really the bank looked at Condillion. The bank relied on Condillion's assets and ability to guarantee the loan and to pay back the money. It didn't look to CEI. It looked to Condillion. And so in the end, when the bankruptcy court was trying to determine, you know, what are assets and liabilities, the court looked at this as though it were an infusion of capital from Condillion to CEI. And therefore, when you do that, you know, assets are greater than liabilities and things. So what was wrong with that? But, Your Honor, that's the case in most guaranteed loans. The bank doesn't feel secure to give a loan without a guarantee. So then, by definition, all loans that are secured by a principal would be an asset of a corporation instead of a liability. And to do equity, this is an equitable decision, to do equity, equity is there to protect the creditors, not the person in control of the situation who can decide whether to pay or not to pay, but the creditors who stand aside and have absolutely no control over the corporation and what it pays and what it doesn't pay. And the only cases that say that you can take a guaranteed loan and make it into an asset of the corporation are the cases under the tax law that say you can up your basis so you have to pay less income taxes. And such a decision to make a guaranteed loan for tax purposes only into an asset of a corporation doesn't hurt the creditors. It doesn't affect the payments that can be made to creditors or not be made to creditors. But in this case, it does, because it allowed, by making a loan on which the corporation is liable and signed on. The other thing that struck me about this was that, you know, in the end, Kandelian does make good. He has to pay the bank, as I recall. Which, doesn't that reduce the debtor's obligations? No, because by the time that Kandelian ultimately paid after he was sued and after CEI was sued, the company was out of business and had closed its door. So it didn't help anybody anymore. Your Honor, it's not in the record, but the unsecured creditors have not received any money yet, unless we recover any money from Mr. Kandelian. Only, you know, wage claims and tax claims and stuff like that. Let me ask you this. You know, at least what I related to is what I understood the Bankruptcy Court did, and correct me if I'm wrong. I mean, the Bankruptcy Court primarily relied on its sort of equitable kinds of, you know, sort of authority and responsibilities. Is that not proper? That is proper, but the Court turned it upside down. If you take the Pepper case, the Supreme Court says, yes, you can look at the balance sheets and you can change things, and what the Court did there is the Court said, therefore, you insider, you principal of this entity, we're going to deny your claim and subordinate it so that the creditors get paid first. Here, the Court actually said, we're going to favor you over all the creditors. It's okay for you to take $2.5 million and the creditors are holding the bag. You know, when the Bankruptcy Court did this, it had these two affidavits, you know, it had these two reports that you were talking about right at the beginning of your remarks, your argument. And the Bankruptcy Court looked at one and looked at the other and decided that the Candelian's expert was more believable, I guess, or was more credible and was going to – and was placing greater weight on his opinion. And so when you take Judge Hawkins's comment earlier, if you look at all the evidence, why was all that clearly erroneous in this context? If the Bankruptcy Court could act in a sort of equitable role, looked at the evidence before it, and weighed it, and said, you know, we're going to favor you over all the creditors, and followed the opinion or adopted the opinion of Candelian's expert. Because what the Court did was inequitable, not equitable. Equitable is you protect the creditors against the people in charge. Where's the rule that – where's the case that says that when the Bankruptcy Court is doing equity, it must – it does so to protect the creditor rather than the debtor? That's the Supreme Court Pepper case, Your Honor. If Candelian had refused to guarantee the loan and the loan had not been made, would CEI have been solvent? The loan had not been made. And if Candelian hadn't taken the $2.5 million, I believe so. No, you're adding to my question. If there came a point in time when the bank was going to make the loan, they were making it based on Candelian's guarantee. If he had refused and the bank had not made the loan, would CEI have been solvent at that point? The answer is no, isn't it? If no loan was ever obtained whatsoever, there wouldn't be a business. Exactly. And what would have been left for the creditors then? There wouldn't be any creditors. Did you want to save a little time for rebuttal? Yes, please. Okay. Thank you. We'll hear from Mr. Candelian's counsel at this time. Ms. Walpert. Thank you, Your Honors. May it please the Court, good afternoon. I'm Dorothy Walpert, and I represent Mr. Candelian and the appellee in this case. I'd like immediately to address the issue that has been raised by the Court and responded to by counsel for the appellant, the issue of protection of creditors. I think Judge Hawkins, you're correct, I don't think there's a case that says that's the standard. But the important fact of this case, and I think the facts are terribly important because the Bankruptcy Court did sit as a court of equity. I think that was actually Judge Paez's comment, but that's fine. I apologize, Judge. It's a credit. The loan, in the first instance, as Your Honor has just pointed out, is what really protected the creditors. When Ms. Verdu says there were no creditors, I'm afraid she's mistaken. There were many creditors. There were people who were providing services to the corporation. There were 1,000 employees. There was the servicing of the city of the Hollywood Park debt. All of these creditors were being paid constantly, and they were being paid with the bank's money. So the creditors were very much protected. On the other end, the tragic end, when it was all over, it was the creditors who were protected from what appellant says was a $4 million liability, because that's what would have had to be paid first. Mr. Candillion paid that liability. So the other thing that's important to note in this case is the unique state of the loan. of a gambling organization. The reason, among others, that the bank, that no bank, would have ever funded this loan is because the corporation could not own a gaming license. An individual must own a gaming license, and Mr. Candillion owned that license. And another reason is that a bank can't own a gaming license. So it's not like taking back real estate or some asset that you can foreclose on. The bank could not look to any asset of the corporation, and that's why Mr. Candillion was it. He was on the line, and he paid and paid and paid. And as we know, this little venture cost him about $6 million and ultimately resulted in his own personal bankruptcy and the loss of his home. But I think that really there are two principles for application in this case. One is clearly that the bankruptcy court, as has been noted, does sit as a court of equity, and it's very important in this case because it is tasked, its job is to look beyond, behind the form and look at the substance of a transaction. And that's what the court tried to do here. The second principle, of course, is that everything in this case turns on that one question of insolvency. How do you define insolvency? And Appellant relies exclusively, really, on the fact that in some accounting papers, the October 31, 1996 financial statement, I guess, of the corporation, the accountants characterized the loan as a liability. And the bankruptcy court said, you know, we don't have to be we're not bound by that. That is not dispositive. First of all, there's no gap that even defines insolvency. It's a factual inquiry. And the court made a very careful factual inquiry. It's clear that bankruptcy courts may rely on expert testimony. It's clear that bankruptcy courts may recharacterize what accountants have said are assets and liabilities. And it's notable, a little curious, actually, that in Appellant's reply brief, they cite the case of In re Sierra Steele, 96 BR 275, in which also the only issue in that case was whether the corporation, the relevant corporation, was insolvent. And what the court held was that it is no error for a bankruptcy court to delete a deferred Federal income tax liability in determining whether a debtor was insolvent. And the court said, you know, we can move these things around. Sometimes what are called assets and liabilities for certain accounting purposes are not true assets and liabilities, and in the bankruptcy setting, we should try to find that out. In re Sierra, they also said that gap, to the extent that that's any of the gaps were relevant here, are relevant, but certainly not controlling. And as the Court inquired at the outset, the determination of insolvency is a finding of fact. It's subject to the clear error of standard. And there was so much evidence before the bankruptcy court, and Judge Mara, and I know the district court's opinion is not as positive here. I think it sort of has disappeared, in effect. But Judge Mara's analysis was remarkably scholarly and detailed, and it was a very good analysis. She found, as had the bankruptcy court, that there was so much evidence that the true asset here was the capital infusion by Mr. Condillion. Far from ever looting this organization or trying to make personal profit in derogation of the rights of the creditors, Mr. Condillion had done just the opposite. He had stepped up to the bat each and every time. And so I think there's ample record to support the findings of the trial court, and no clear error, so that this Court should affirm. Roberts. Ms. Wolpert, assuming that the finding on insolvency was not clearly erroneous, does that take care of the second part of the fraudulent transfer or bases that were asserted here? That is, here it was a the next step in this one provision would have been equivalent value. So is that a two-part test? That is, this one? It is not, Your Honor. It's conjunctive. The statute says both. You have to have both. You do. And, in fact, Judge Morrow found, as Counsel for Appellant clearly pointed out, that the notion that the corporation had received equivalent value was in error, in her opinion. She thought that was error, because she said, in effect, it was a Hobson's choice, that you couldn't have it both ways. If the loan – but what she pointed out to Appellant was that it wouldn't help them, because if the loan truly was a loan to the corporation, then the guarantee might quite properly have constituted reasonable equivalent value. But if it was only a loan to Candelia, as she found and as the trial court found, then it wasn't necessary for there to be equivalent value because it wasn't a liability of the corporation, and therefore it was not rendered insolvent. So that that is a conjunctive requirement, and the fact that the corporation was found on so many different bases not to be insolvent made any further inquiry really irrelevant. And does that insolvency findings also knock out the last basis that I guess was lied upon here, that it was intended to fraud? Yes, Your Honor. Yes. So it would take care of that as well. If there's no – if you have a solvent corporation, then that inquiry falls away. There's just really no necessity because it's a liability. That basically takes care of the two California Corporation Code claims. Yes, Your Honor. We believe it does. All right. I don't see any other questions, counsel. Thank you for your argument very much. Thank you, Your Honor. Rebuttal? Your Honor, may I have some rebuttal? Certainly, ma'am. I'd like to respond that under the Fraudulent Transfer Act, under 3439.04, the actual intent to hinder the lay or the fraud character, such a transfer does not require that – that there is consideration given. Well, what's the evidence here of fraud and – The bank specifically told me something earlier. Once you accept the finding that it was solvent. That it was solvent? Yes. My question to Ms. Wolpert was, assuming that the finding of insolvency was not clearly erroneous, doesn't that basically take care of the claim that there was fraud? May I misunderstand your question? Well, there was another basis in the part – apart from – from insolvency and equivalent value, right? Yes. I forget what the provision is. A transfer with an intent to hinder the lay or the fraud characters. And what happened in this case, Mr. Kandelian told the bank, I will not take a dividend. It was specifically put in the commitment letter and in the loan documents. And he signs the loan documents, and the next day he takes dividends, $2.5 million worth of that. He could not have forgotten that he signed the papers the day before, and he promised not to do that. The other thing is, California Corporations Code 500A says you cannot take a dividend unless you've obtained earnings are at least equal to the amount you're taking as a dividend. And on October 25th, when Mr. Kandelian took the dividend and obtained earnings, were a negative $501. So, you don't need an insolvency analysis. You don't need a consideration. You just follow the test. And then, of course, under JAX, the JAX case, it doesn't matter whether or not you give consideration. If the company was insolvent when the transfer was made, it doesn't matter whether there's consideration. The assets of the corporation are a trust fund. You cannot pay an insider or yourself unless you pay a catechist first. OK, I don't see any other questions. Thank you very much for your argument. Thank both sides for the argument. The case just argued will be submitted for decision, and the court will stand in recess for the afternoon.
judges: Hawkins, Graber, Paez